Exclusive of some $1,500 of jewelry bequeathed in kind, the deceased left an estate, which (when reduced to cash) aggregated a total of $37,649.93. After deducting $4,149.93 for expenses there was left $33,500, out of which her executor proposes to pay 27 undisputed special cash legacies aggregating $33,275.
In addition to the legacies above said, the deceased, by her will of October 7, 1904, made also the following special legacies: *Page 78 
 "I give and bequeath my gold watch and chain to Ida Fessler.
 * * * * * * * *
 "To my God-son Charles Fessler, I give and bequeath $8,000."
By a codicil, dated May 24, 1911, the testatrix declared:
 "Leave portion of Ida Fessler to her mother Belle, account of child's death.
 * * * * * * * *
 "Part of Chas. Fessler revoke(d), on account of his education at Holy Cross College."
 I.
It is admitted that Charles Fessler entered Holy Cross College on November 10, 1909, and graduated therefrom on June 24, 1913, being then about 16 years of age; that his college expenses for that period amounted to $1,000 (about); that all these expenses were charged to, and paid, by the deceased, Miss Ida Rusha.
Charles Fessler claimed (and his heirs now claim) that the provision in the codicil of May 24, 1911, relating to him, was a mere reduction of $1,000 in the legacy made to him, and that he (and now his heirs) should be allowed to participate in the distribution of the estate pro rata with the 27 cash legatees, on the basis of a $7,000 legacy to him (i.e. $8,000 less $1,000). And his heirs seek to have the executor's account amended accordingly (he having died after the testatrix, but before the filing of the account).
 II.
A considerable amount of conflicting testimony as to verbal expressions by the deceased, concerning her intentions testamentary towards her godson and protégé Charles Fessler, was admitted by the trial judge over the objection of the executor.
But we think all such evidence should have been excluded, or at least should ultimately have been disregarded.
Testamentary dispositions can be made only in writing in the form and manner *Page 79 
prescribed by law for wills. Hence testamentary dispositions cannever be established, as such, by any amount of parol evidence as to the verbally declared intentions of the deceased. And it is but one step from the explaining of a written testamentary disposition by proof of the verbal declarations of the testator, to the establishing of a verbal testamentary disposition; the line of demarcation between the two being very fine, if indeed it exists at all.
The Code nowhere expressly permits evidence of the testator's verbal declarations when seeking for his intention, and in one instance at least seems to forbid it. R.C.C. art. 1714. Thus:
 "Art. 1714. In case of ambiguity or obscurity in the description of the legatee, as, for instance, when a legacy is bequeathed to one of two individuals bearing the same name, the inquiry shall be which of the two was upon terms of the most intimate intercourse or connection with the testator, and to him shall the legacy be decreed." (Italics ours.)
In Succession of Thorame, 12 La. Ann. 384, and again in Succession of Tilton, 133 La. 435, 63 So. 99, there was obscurity in the description of the legatee, but we do not find that any evidence was admitted, or if admitted considered by the court, of any verbal declarations by the testator as to who that legatee should be; but the court considered only the facts and circumstances under which the will was made, and decided on those alone. See R.C.C. art. 1715.
 III.
But in any event, to whatever extent parol evidence may be admissible for the purpose of explaining ambiguous terms in a testament, it can never serve to depart "from the proper signification of the terms of the testament." R.C.C. art. 1712.
In the case before us it is said that the terms of the codicil of May 24, 1911, are ambiguous. We think not. The terms of the *Page 80 
codicil are, "Part of Charles Fessler revoke(d), on account of his education at Holy Cross College." If the first five words stood alone there could be neither doubt nor obscurity whatsoever as to the meaning; thus, "Part of Charles Fessler revoked." And the only possible obscurity, if any, results from the addition of the words "on account of his education at Holy Cross College." But the testatrix has herself furnished in that same codicil the key to her use of those words. Thus, "Leave portion of Ida Fessler to her mother Belle, account of child's death." Both clauses were written at the same time and in the same language; and therefore express the same thought; and that thought very clearly was the giving of a reason for the disposition made. Therefore, what the testatrix had in mind was clearly this, that she meant to affect in some manner (whether by revocation or by reduction) the legacy in favor of Charles Fessler, because she was giving him an education.
But the testatrix used the word revoked, not "reduced"; and we cannot depart from the proper signification of the term used by her, and substitute therefor another term having a different signification. R.C.C. art. 1712.
Our conclusion is that the district judge erred, first, in admitting, over the objection of the executor, parol evidence of the testator's verbal declarations as to her testamentary intentions towards Charles Fessler; but more especially in giving effect thereto, and thus departing from "the proper signification of the terms of the testament."
 Decree.
The judgment appealed from is therefore reversed; and it is now ordered that the oppositions to the final account herein filed be rejected, and that said account be now approved and the funds distributed accordingly; opponents to pay the costs of their opposition and of this appeal. *Page 81